## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                :

Raritan Baykeeper, Inc., d/b/a NY/NJ Baykeeper,     :   Case No. 1:20-cv-471
                                  :

                Plaintiff,               :   **COMPLAINT FOR**
                                  :   **DECLARATORY AND**
        v.                          :   **INJUNCTIVE RELIEF AND**
                                  :   **CIVIL PENALTIES**
J. Bruno & Sons, Inc.,                     :
                                  :   (Federal Water Pollution Control
               Defendant.          :   Act, 33 U.S.C. §§ 1251–1387)
                                  :
------------------------------------------------------------- X

Plaintiff RARITAN BAYKEEPER, INC., by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1.      This is a civil suit brought under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387, commonly known as the Clean Water Act ("CWA" or "the Act"), to address and abate Defendant's ongoing and continuous violations of the Act pursuant to the Act's citizen suit enforcement provisions at CWA Section 505, 33 U.S.C. § 1365.

2.      Defendant discharges polluted stormwater runoff from its waste material recycling and vehicle/equipment maintenance facility, located at 280 Meredith Avenue, Staten Island, New York (the "Facility"), into the waters of the United States without authorization, in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a) and 1342(p), and has failed to obtain coverage under and comply with the conditions of an individual State Pollutant Discharge Elimination System ("SPDES") permit or the New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges

1

Associated with Industrial Activity, Permit No. GP-0-17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf ("General Permit"), in violation of CWA Sections 402(p)(3)(A) and (p)(4)(A), 33 U.S.C. §§ 1342(p)(3)(A), (p)(4)(A), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

3.      Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into the New York Harbor, Long Island Sound, and other receiving waters in this District.  The State of New York has designated as "impaired" more than 7,000 river miles; 319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of coastal shoreline; and 592 miles of Great Lakes shoreline.  Under the Clean Water Act, "impaired" means not meeting water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

4.      Defendant's stormwater discharges contribute to this endemic stormwater pollution problem.  Defendant engages in industrial activities such as: (a) crushing, processing, recycling, and storing recycled construction and demolition waste and debris; (b) storing waste materials outdoors; (c) vehicle storage and maintenance, including trucks and heavy equipment; and (d) vehicle traffic in and out of the Facility.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to adjacent

wetlands.  Those wetlands flow into Pralls Creek and the Arthur Kill, which separates Staten

Island and New Jersey and connects Newark Bay (on its north) to Raritan Bay (on its south).

Contaminated stormwater discharges such as those from the Facility can and must be controlled

to the fullest extent required by law in order to allow these water bodies a fighting chance to

regain their health.

## II.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the parties and this action pursuant

to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and

28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.      On November 25, 2019, Plaintiff provided notice of Defendant's violations of the

Act and of its intention to file suit against Defendant to Defendant, Defendant's registered agent;

the Administrator of the United States Environmental Protection Agency ("EPA"); the

Administrator of EPA Region II; and the Commissioner of the New York Department of

Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A),

33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A

true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated

herein by reference.

7.      More than sixty days have passed since the notice letter was served on Defendant

and the state and federal agencies.  Plaintiff has complied with the Act's notice requirements

under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

8.      Neither the EPA nor the State of New York has commenced or is diligently

prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See*

3

CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

9.      This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

10.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

**III.**

**PARTIES**

11.     Plaintiff RARITAN BAYKEEPER, INC. ("Baykeeper"), doing business as "NY/NJ Baykeeper," is a non-profit corporation, whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hudson-Raritan Estuary through enforcement, field work, and community action.  Baykeeper has approximately 225 members in the New York and New Jersey region, many of whom use and enjoy New York Harbor and its tributaries—including Pralls Creek and the Arthur Kill, which are polluted by industrial stormwater runoff from Defendant's Facility.

12.     Plaintiff's members use and enjoy the waters which Defendant has unlawfully polluted and is unlawfully polluting.  Plaintiff's members use those areas to fish, sail, boat, kayak, swim, birdwatch, photograph, view wildlife and engage in nature study and scientific study, among other activities.  Defendant's discharges of stormwater associated with industrial activity containing pollutants impair each of those uses.  Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act.

4

13.     The relief sought herein will redress the harms to Plaintiff and its members caused by Defendant's activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

14.     Plaintiff is informed and believes, and thereupon alleges, that Defendant J. BRUNO & SONS, INC. ("J. Bruno") is a corporation incorporated under the laws of the State of New York that owns and operates a waste material recycling and vehicle/equipment maintenance facility, located at 280 Meredith Avenue, Staten Island, New York (the "Facility").

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

15.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

16.     The CWA prohibits the discharge of pollutants from a "point source" into the waters of the United States without a National Pollutant Discharge Elimination System ("NPDES") permit.  A NPDES permit requires dischargers of pollution to comply with various limitations.

17.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R.

§ 123.25(a).

18.     In New York, DEC has been delegated the authority to issue NPDES permits.

Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the

Clean Water Act, are referred to as "SPDES" permits.

## Stormwater Permits

19.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress

enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial

Stormwater Discharges."

20.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated

stormwater discharge regulations at 40 C.F.R. § 122.26.

21.     In promulgating those regulations, EPA cited abundant data showing the harmful

effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular,

EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an

annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels

discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

22.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26

require NPDES permits for stormwater discharges "associated with industrial activity."

23.     40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with

industrial activity must apply for an individual permit, apply for a permit through a group application,

or seek coverage under a general permit.

24.     40 C.F.R, § 122.26(b)(13) defines "storm water" to include stormwater runoff, snow

melt runoff, and surface runoff and drainage.

25.     40 C.F.R. § 122.26(b)(14) specifies that "storm water discharge associated with

6

industrial activity" includes stormwater discharge from facilities classified under Standard Industrial Classification ("SIC") codes 4212 (local trucking, without storage) and 5093 (scrap and waste materials).  Facilities in those industrial categories must obtain NPDES permit coverage for their stormwater discharges.

**New York's General Permit for the**
**Discharge of Stormwater Associated with Industrial Activity**

26.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  The current version of the General Permit came into effect on March 1, 2018.  DEC also has the authority to issue SPDES permits for individual applicants.

27.     In order to discharge polluted stormwater lawfully in New York, industrial dischargers must either obtain coverage under the General Permit and comply with its terms or obtain coverage under and comply with an individual SPDES permit.

28.     To obtain coverage under the General Permit, a facility discharging stormwater associated with industrial activity is required to submit to DEC a registration form called a "Notice of Intent."  General Permit, Part I.D.1.a.2.

29.     In order to comply with the General Permit, a facility owner or operator must reduce the discharge of pollution from the facility through use of the best available technology.  The owner or operator also must comply with numeric effluent limitations on the quantity and concentration of pollutants discharged from the facility established in the General Permit, as well as narrative ("non-numeric") effluent limits established in the General Permit.  Facility owners and operators reduce pollution and comply with effluent limitations primarily by adopting "best management practices" that reduce the discharge of polluted stormwater.  Best management

practices ("BMPs") include both changes to industrial practices and activities (for example, more frequent inspections and site clean ups) and structural changes to the property that prevent stormwater from coming into contact with pollutants or otherwise reduce the amount of polluted stormwater eventually discharged from the facility. In addition, the owner or operator must perform inspections, conduct monitoring and sampling, and meet other requirements of the General Permit.

30.      Before submitting a Notice of Intent to DEC, a facility discharging stormwater associated with industrial activity must first prepare, make available, and implement a Storm Water Pollution Prevention Plan ("SWPPP").  General Permit, Part I.D.1.a.1.  Among other things, the SWPPP must document the best management practices that the facility has implemented to ensure that it is reducing the discharge of pollution from the facility to the extent practicable through use of the best available technology for the industry.

### CWA Citizen Enforcement Suits

31.      Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

32.      Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

33.      Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

34.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

35.     Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation for violations occurring before November 2, 2015 and up to $52,414 per day per violation for violations occurring after that date.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### Defendant Controls the Industrial Activities at the Facility

36.     On information and belief, the Defendant was incorporated in 1982 and, since then, has operated a waste material recycling and vehicle/equipment maintenance facility at 280 Meredith Avenue in Staten Island, New York.

37.     The Defendant advertises itself (by means of a website, www.jbrunoandsons.com, a sign on the premises of the Facility, and logos on its trucks) as the owner and operator of the waste material recycling and vehicle/equipment maintenance facility at 280 Meredith Avenue in Staten Island, New York.

38.     On its website, J. Bruno states, "We can provide trucking, heavy equipment, fill materials, and commercial snow removal for all phases and types of construction."  *J. Bruno & Sons, Inc.*, www.jbrunoandsons.com (last visited January 28, 2020).  Further, its website states, "Our transfer station accepts fill, broken concrete, broken, asphalt, [and] rip rap."  *Id.*

39.     Because the Defendant controls the industrial activities that take place at the Facility, the Defendant is responsible for managing stormwater associated with those activities at the Facility in compliance with the Clean Water Act.

40.     The Defendant is the person, as defined by CWA Section 502(5), 33 U.S.C.

9

§ 1362(5), responsible for the violations alleged in this Complaint.

**Defendant's Industrial Activities Expose Pollutants to Stormwater**

41.     J. Bruno's activities at the Facility include, but are not limited to, assembling, dismantling, sorting, and distribution of scrap and waste materials and storage and maintenance of vehicles and other heavy equipment.

42.     Many of J. Bruno's activities at the Facility are conducted outdoors.  Thus, in engaging in industrial activities at the Facility, J. Bruno stores and handles its materials, vehicles, and equipment in a manner that exposes pollutants to precipitation and snowmelt.

43.     The Facility has exposed—and continues to expose—industrial pollutants to stormwater by: (a) crushing, processing, and recycling construction and demolition waste material and debris outdoors; (b) storing recycled materials, waste material, and debris outdoors; (c) conducting vehicle maintenance and parking vehicles awaiting maintenance outdoors; and (d) tracking pollutants off-site by vehicles entering and leaving the Facility.

44.     Through these industrial activities, J. Bruno exposes stormwater to a wide variety of pollutants, including but not limited to: heavy metals, such as mercury and lead; industrial solvents; paint and paint solvents; battery acid; hydraulic, transmission, and brake fluids; oil, grease, and lubricants; fuel and fuel additives; and suspended and dissolved solids.  *See generally* EPA, *Industrial Stormwater Fact Sheet Series: Sector N*, EPA-833-F-06-029, at 2–4 (Dec. 2006), https://www.epa.gov/sites/production/files/2015-10/documents/sector_n_ scraprecycling.pdf (listing common pollutants associated with scrap and waste recycling facilities); EPA, *Industrial Stormwater Fact Sheet Series: Sector P*, EPA-833-F-06-031, at 2–3 (Dec. 2006), https://www.epa.gov/sites/production/files/2015-10/documents/sector_p_

transportationfacilities.pdf (listing common pollutants associated with motor freight

transportation facilities).

### Defendant Discharges Polluted Stormwater
### From the Facility Into Waters of the United States

45.     During precipitation events, including rainfalls and also snow or ice melt events,

stormwater flows freely from the Facility into adjacent wetlands.

46.     The wetlands, in turn, flow into Pralls Creek and the Arthur Kill.

47.     The Arthur Kill connects Raritan Bay and Newark Bay, which in turn are

connected to New York Harbor.

48.     The wetlands, Pralls Creek, the Arthur Kill, Raritan Bay, Newark Bay, and New

York Harbor are all "waters of the United States."

49.     J. Bruno's industrial activity at the Facility has caused and continues to cause a

"discharge of pollutants" within the meaning of CWA Section 502(12), 33 U.S.C. § 1362(12),

and a "stormwater discharge associated with industrial activity" within the meaning of 40 C.F.R.

§ 122.26(b)(14) from the Facility on at least each and every day that there has been a

precipitation event greater than 0.1 inches. (EPA has determined that precipitation greater than

0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of

evaluating stormwater runoff associated with industrial activity.  *See, e.g.*, 40 C.F.R. §

122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event)).

### Defendant(s) has not Obtained Permit Coverage for These Discharges

50.     Upon information and belief, the Facility is not covered by an individual SPDES

permit.

51.     Upon information and belief, the Facility is not covered by the General Permit.

52.     Upon information and belief, Defendant has not filed a registration with DEC seeking General Permit coverage for the Facility.

53.     Upon information and belief, Defendant has not complied with any provisions of the General Permit.

54.     Accordingly, on November 25, 2019, Plaintiff sent Defendant, via certified mail, the notice of intent to sue described above and attached to this Complaint as Exhibit A.

55.     From November 25, 2019 through January 24, 2020—the 60-day notice period required by the CWA—Defendant did not respond to the notice letter.

56.     On information and belief, as of the date of filing of this Complaint, the Facility still lacks NPDES permit coverage under the General Permit or a SPDES permit.

57.     Defendant's violations of the Clean Water Act at the Facility are ongoing and continuous, capable of repetition, and result from the same underlying and inadequately resolved causes as the aforementioned violations.

**VI.**

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Unlawful Discharge of Pollutants**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

58.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

59.     CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

60.     CWA Section 502(5), 33 U.S.C. § 1362(5), defines "person" to include "an

individual, corporation, partnership [or] association."

61.     CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

62.     CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

63.     CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

64.     40 C.F.R. § 122.2 defines "waters of the United States" to include, *inter alia*: (i) "All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide"; (ii) "All interstate waters, including interstate 'wetlands'"; (iii) Tributaries to such waters; (iv) Wetlands adjacent to such waters or their tributaries; and (v) "All other waters . . . the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce."

65.     CWA Section 402(p), 33 U.S.C. § 1342(p) and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i), require facilities discharging stormwater associated with industrial activity to obtain a NPDES permit.

66.     Defendant has discharged and continues to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without a NPDES permit.

67.     Each and every day on which Defendant discharges stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

68.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

69.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Failure to Apply for NPDES Permit Coverage
### (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)

70.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

71.     40 C.F.R. § 122.26(c)(1) and 122.26(e)(1) require dischargers of stormwater associated with industrial activity to apply for an individual permit or seek coverage under a promulgated stormwater general permit by October 1, 1992.

72.     Since at least 1982, Defendant has operated and continues to operate a facility that engages in "industrial activity" as that term is defined in 40 C.F.R. § 122.26(b)(14).

73.     Since that time, Defendant has routinely discharged polluted stormwater associated with industrial activity from the Facility to waters of the United States.

74.     Therefore, since that time, Defendant has been obligated to apply for coverage under an individual or general NPDES permit.

75.     Once Defendant began discharging polluted stormwater associated with industrial activity to waters of the United States, each and every subsequent day on which Defendant failed to apply for permit coverage constitutes a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

14

76.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

77.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION

**Failure to Implement Adequate Control Measures and Best Management Practices
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

78.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

79.     The General Permit, Parts II.D and VII, requires Defendant to implement mandatory general and sector-specific control measures called Best Management Practices ("BMPs") in order to minimize the discharge of pollutants from the Facility.

80.     The selected measures must reduce the discharge of pollution from the Facility through use of the best available technology for the industry in order to comply with both numeric and narrative effluent limits contained in the permit.

81.     For example, the General Permit, Part II.A, requires Defendant to minimize the exposure of pollutants to stormwater at the Facility and—to the extent pollutants are exposed to stormwater despite Defendant's best efforts—to minimize the ultimate discharge of those pollutants in stormwater from the Facility.

82.     Under the General Permit, Part II, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures (including Best Management Practices (BMPs) selected and designed in accordance with Part II.D) that are technologically available and economically practicable and achievable in light of best industry practice."

83.     To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology

15

Economically Achievable ("BAT" or "BATEA") or Best Conventional Pollutant Control

Technology ("BCT"), depending upon the type of pollutant being discharged.  CWA

§ 301(b)(2)(A), (E), 33 U.S.C. § 1311(b)(2)(A), (E).

84.     Because some of the industrial activities carried out at the Facility are categorized

in SIC Code 4212, Defendant must implement the sector-specific control measures specified in

Part VII of the General Permit for Sector P.

85.     Because some of the industrial activities carried out at the Facility are categorized

in SIC Code 5093, Defendant must also implement the sector-specific control measures specified

in Part VII of the General Permit for Sector N.

86.     Plaintiff is informed and believes, and thereupon alleges that, as of the filing date

of this Complaint, Defendant has not implemented adequate control measures or BMPs required

by the General Permit.

87.     Defendant has failed, and continues to fail, to implement adequate control

measures and BMPs at the Facility as required by the General Permit.

88.     Defendant's ongoing failure to implement adequate control measures and BMPs

at the Facility is evidenced by: (a) Defendant's crushing, processing, and recycling of

construction and demolition waste material and debris outdoors, without appropriate BMPs to

cover these activities or otherwise limit contact with stormwater; (b) Defendant's outdoor storage

of construction and demolition materials and debris, including recycled and waste materials,

without appropriate BMPs to cover these activities or otherwise limit contact with stormwater;

(d) Defendant's continued tracking of waste onto public streets from the operation and

maintenance of vehicles at the site, including trucks and heavy machinery; and (e) Defendant's

failure to either treat stormwater prior to discharge or to implement effective stormwater containment practices.

89.     Each and every day on which Defendant fails to comply with the General Permit's control measure and BMP requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

90.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

91.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

**Failure to Develop, Implement, and Make Available an
Adequate Storm Water Pollution Prevention Plan
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

92.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

93.     The General Permit, Part III, requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

94.     As described in Part III.A.3 of the General Permit, the SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

95.     Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

96.     The SWPPP must address, at a minimum: (1) each of the universally applicable elements set forth in Part III.A of the General Permit; (2) each of the applicable sector-specific

plan elements specified in Part VIII of the General Permit, *see* Part III.A.7; and, (3) as applicable, additional special requirements listed in Part III.D of the General Permit for discharges through a municipal separate storm sewer or discharges to impaired waterbodies. Each of these elements also require the discharger to maintain records and documentation of compliance with each of these elements.

97.     The SWPPP must be representative of current site conditions and kept up to date. General Permit, Part III.E.

98.     The SWPPP must be signed in accordance with Appendix H.8 of the General Permit and, where the facility is active, retained on-site in accordance with Parts III.A.9 and VI.C.  General Permit, Part III.C.1.

99.     The SWPPP must be prepared and must provide for compliance with the terms of the General Permit on or before the date of submission of a Notice of Intent to be covered under the General Permit.  General Permit, Part I.D.1.a.1.

100.    Because some of the industrial activities carried out at the Facility are categorized in SIC Code 4212, Defendant must include the sector-specific SWPPP elements specified in Part VII of the General Permit for Sector P, in addition to the SWPPP elements set forth in Part III of the General Permit.  General Permit, Part III.A.7.

101.    Because some of the industrial activities carried out at the Facility are categorized in SIC Code 5093, Defendant must include the sector-specific SWPPP elements specified in Part VII of the General Permit for Sector N, in addition to the SWPPP elements set forth in Part III of the General Permit.  General Permit, Part III.A.7.

18

102.     Under Part III.C.2.c. of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within fourteen (14) days of receipt of a written request."

103.     Plaintiff requested a copy of Defendant's SWPPP on November 25, 2019.

104.     Defendant has not provided a copy of a SWPPP to Plaintiff.

105.     Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this Complaint, Defendant had not developed a SWPPP.

106.     Defendant has failed, and continues to fail, to develop, implement, and maintain compliance with and make available an adequate SWPPP for the Facility as required by the General Permit and to take the other SWPPP-related actions required by the General Permit and described herein.

107.     Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility and to take the other SWPPP-related actions required by the General Permit is further evidenced by Defendant's failure to implement adequate control measures and BMPs, as set forth above.

108.     Each and every day on which Defendant fails to comply with the General Permit's SWPPP requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

109.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

110.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION

### Failure to Conduct Routine Site Inspections and Comply with
### General Monitoring, Recordkeeping, and Reporting Requirements
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

111.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

112.    The General Permit requires industrial dischargers to conduct and document comprehensive site inspections at appropriate intervals, but in no event less frequently than once a year.  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected.  General Permit, Part IV.A.1.  Records of this inspection must be kept for at least five (5) years.  General Permit, Part IV.A.2.

113.    In addition to or alongside the annual comprehensive inspection, industrial discharges must also conduct an annual "dry inspection" to ensure there are no non-stormwater sources being discharged into the stormwater system.  General Permit, Part IV.C.

114.    Qualified personnel must also carry out routine inspections of the facility's stormwater management practices at least quarterly.  General Permit, Part IV.B.  During these inspections, personnel must inspect all areas of the facility where industrial materials or activities are exposed to stormwater, evaluate the performance of stormwater BMPs identified in the facility's SWPPP, and document any deficiencies in the implementation or adequacy of the BMPs.  Such deficiencies must then be addressed through corrective actions under Part V of the General Permit.  General Permit, Part IV.B.4.

115.    In addition to inspections, all covered facilities must conduct multiple types of analytical monitoring, including quarterly visual inspections of stormwater discharges and sampling and laboratory analysis of outfalls from all qualifying storm events.  General Permit, Parts IV.D–F.

20

116.   Further, Defendant engages in industrial activities that fall within Sectors N and P of the General Permit's classifications of industrial activity, and therefore must also conduct additional analysis of water quality samples for a range of pollutant parameters as set forth in Part VII of the General Permit.  General Permit, Part VI.F.

117.   Records of these monitoring efforts must be maintained for at least five (5) years from the date of the sample, measurement, report, or application.  General Permit, Part VI.C.2.

118.   Covered facilities are required to report on the results of their monitoring efforts to the DEC, through Annual Certification Reports, Discharge Monitoring Reports, and supplemental reports as necessary.  General Permit, Part VI.A–B.

119.   Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant had not conducted any of the site inspections, monitoring, or sampling required by Part IV of the General Permit.

120.   Defendant has failed, and continues to fail, to comply with the inspection, monitoring, and sampling requirements of the General Permit.

121.   Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant also has failed to retain records and submit monitoring reports as required by Parts IV and VI of the General Permit.

122.   Each and every day on which Defendant fails to comply with any of the General Permit's inspection, monitoring, recordkeeping, and reporting requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

123.   Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

124.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit Requirements Applicable to the
Scrap Recycling & Waste Recycling Facilities Sector and the
Land Transportation &/or Warehousing Sector
(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

125.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

126.    The General Permit contains various requirements specific to scrap recycling and waste recycling facilities.  General Permit, Part VII.N (requirements for Sector N).

127.    Defendant has failed, and continues to fail, to comply with the requirements of the General Permit that apply to all scrap recycling and waste recycling facilities.

128.    The General Permit also contains various requirements specific to land transportation and/or warehousing.  General Permit, Part VII.P (requirements for Sector P).

129.    Defendant has also failed, and continues to fail, to comply with the requirements of the General Permit that apply to land transportation and/or warehousing.

130.    To the extent that Defendant's failure to comply with these sector-specific requirements is not captured in the above Causes of Action, such failure is included here.

131.    Each and every day on which Defendant fails to comply with the General Permit's sector-specific requirements applicable to scrap and waste recycling facilities or land transportation and/or warehousing facilities is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

132.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

133.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit Requirements Applicable to
Facilities that Discharge to an Impaired Waterbody
(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

134.   Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

135.   Discharges to an impaired waterbody are not eligible for coverage under the

General Permit if the cause of impairment is a pollutant of concern included in the "benchmarks"

or "effluent limitations" (as those terms are defined in the General Permit) to which the facility is

subject, unless the facility:

      a.   Prevents all exposure to stormwater of the pollutant(s) for which the waterbody is

          impaired, and maintains all analysis and documentation supporting such eligibility

          with the SWPPP;

      b.   Documents that the pollutant for which the waterbody is impaired is not present

          on-site, and maintains all analysis and documentation supporting such eligibility with

          the SWPPP; or

      c.   Provides additional information in the SWPPP to minimize the pollutant of

          concern causing the impairment as specified in Part III.D.2 of the General Permit.

General Permit, Part II.C.2.

136.   DEC has designated the Arthur Kill as an impaired water.  DEC, *Final 2016*

*Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy* 8 (Nov. 2016),

https://www.dec.ny.gov/docs/water_pdf/303dListfinal2016.pdf.

137.   One of the causes of impairment is excessive oxygen demand (and thus low

dissolved oxygen in the water).  *Id.*  Chemical Oxygen Demand is a parameter included in the

benchmarks to which Defendant's facility is subject under both Sectors N and P.

138. Another cause of impairment is PCBs and other toxins, which "may include mercury, dioxins/furans, PAHs, pesticides, and other heavy metals." *Id.* at 21, 20 n.40. Heavy metals, specifically cadmium, chromium, and lead, are parameters included in the benchmarks to which Defendant's facility is subject under Sector N.

139. Defendant has not prevented all exposure of substances that create chemical oxygen demand or contribute heavy metals to stormwater.

140. Defendant has not documented that such substances are not present onsite.

141. Defendant has not submitted a SWPPP with the additional information specified in Part III.D.2 of the General Permit.

142. Defendant is violating the requirements of the General Permit related to stormwater discharge to impaired waterbodies.

143. Each and every day on which Defendant violates the General Permit's requirements governing discharges to impaired waterbodies is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342.

144. Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

145. Wherefore, Plaintiff prays for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

146. Wherefore, Plaintiff Baykeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

24

a.   Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b.   Enjoin Defendant from discharging pollutants from the Facility except as authorized by and in compliance with a NPDES permit;

c.   Order Defendant to immediately apply for coverage under, and comply fully with all applicable requirements of, the General Permit (or an individual SPDES permit that is at least as stringent);

d.   Order Defendant to take appropriate actions to remediate the harm caused by its violations of the General Permit and the Clean Water Act, to the extent possible;

e.   Order Defendant to pay civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a), and 40 C.F.R. §§ 19.1 – 19.4;

f.   Order Defendant to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

g.   Award any such other and further relief as this Court may deem appropriate.

Dated this 28th day of January, 2020
New York, New York

Respectfully submitted,

By:  /s/  *Edan Rotenberg*

Edan Rotenberg

SUPER LAW GROUP, LLC
180 Maiden Lane, Suite 603
New York, NY 10013

*Attorney for Plaintiff*

# EXHIBIT A

## NOTICE OF INTENT TO SUE

# SUPER LAW GROUP, LLC

November 22, 2019

**Via Certified Mail, Return Receipt Requested**

J. Bruno & Sons, Inc.
280 Meredith Avenue, Bldg. E
Staten Island, New York 10314

Anothony Bruno (Registered Agent)
280 Meredith Avenue, Bldg. E
Staten Island, New York 10314

J. Bruno & Sons, Inc.
150 Finley Ave.
Staten Island, New York 10306

Re:     Notice of Violation and Intent to File Suit under the Clean Water Act

To Whom It May Concern,

We are writing on behalf of Raritan Baykeeper Inc. (d/b/a NY/NJ Baykeeper) ("Baykeeper"),[1] to notify you of Baykeeper's intent to file suit against J. Bruno & Sons, Inc. ("J. Bruno") pursuant to Section 505(a) of the federal Clean Water Act ("CWA")[2] for violations of the CWA.

Baykeeper intends to file suit, as an organization and on behalf of its adversely affected members, in the United States District Court for the Eastern District of New York seeking appropriate equitable relief, civil penalties, and other relief no earlier than 60 days from the postmark date of this letter.[3]

Baykeeper intends to take legal action because J. Bruno is discharging polluted stormwater from its waste material recycling and vehicle/equipment maintenance facility located at 280 Meredith Avenue, Staten Island, NY ("the Facility"), to the waters of the United States without a permit in violation of Sections 301(a) and 402(p)(2)(B) of the Clean Water Act.[4] Further, J. Bruno has not applied for coverage under, nor complied with the conditions of, an individual National Pollutant Discharge Elimination System ("NPDES") permit or the General

---

[1] Raritan Baykeeper, Inc. (d/b/a NY/NJ Baykeeper), is a non-profit public interest 501(c)(3) corporation, whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hudson-Raritan Estuary through enforcement, field work, and community action.  Baykeeper has approximately 225 members in the New York and New Jersey region, many of whom use and enjoy New York Harbor, which is polluted by industrial stormwater runoff discharged by facilities in New York City that are or should be covered by the General Permit and New Jersey that must comply with New Jersey's Basic Industrial Stormwater General Permit.
[2] 33 U.S.C. § 1365(a). We refer to statutory provisions by their section in the Clean Water Act and provide the parallel citation to the United States Code only on first reference.
[3] *See* 40 C.F.R. § 135.2(a)(3)(c) (notice of intent to file suit is deemed to have been served on the postmark date).
[4] 33 U.S.C. §§ 1311(a) and 1342(p)(2)(B).

Notice of Violation and Intent to File Suit
November 22, 2019
Page 2 of 13

Permit for the Discharge of Stormwater Associated with Industrial Activity ("General Permit")[5] issued by the New York State Department of Environmental Conservation ("DEC"), in violation of Sections 402(p), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

# I.

## BACKGROUND

With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into New York Harbor, Long Island Sound, and other receiving waters.  The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the marine environment each year.[6]

DEC has designated more than 7,000 river miles, 319,000 acres of larger waterbodies, 940 square miles of bays and estuaries, and 592 miles of Great Lakes shoreline in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation.[7]  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.  Contaminated stormwater discharges can and must be controlled in order to improve the quality and health of these waterbodies.

Stormwater discharges flow from the Facility into adjacent wetlands, and these wetlands flow into the Pralls Creek and the Arthur Kill. The Arthur Kill separates Staten Island and New Jersey and connects Raritan Bay on its south end with Newark Bay on its north.  DEC has classified Pralls Creek, the portion of the Arthur Kill where the Facility discharges, as an SD water.[8]  Under New York's Water Quality Standards, a waterbody that is designated as SD is meant to be suitable for fishing and for fish, shellfish and wildlife survival.[9]  The New York Water Quality Standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and others.  A waterbody must meet these numeric and narrative criteria in order to support its designated uses.[10]

---

[5] New York State Department of Environmental Conservation, *SPDES Multi-Sector General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-17-004, (hereinafter "General Permit"), *available at* http://www.dec.ny.gov/chemical/9009.html. This General Permit replaces earlier general permits for the discharge of stormwater associated with industrial activity. The current General Permit became effective on March 1, 2018 and will expire on February 28, 2023.

[6] Stormwater is water from precipitation events that flows across the ground and pavement after it rains or after snow and ice melt.  *See* 40 C.F.R. § 122.26(b)(13).

[7] *See* EPA, Watershed Assessment, Tracking and Environmental Results, New York Assessment Data for 2012, http://ofmpub.epa.gov/waters10/attains_state.report_control?p_state=NY&p_cycle=2012&p_report_type=A (last visited Oct. 14, 2014).

[8] *See* 6 N.Y.C.R.R. § 890.6

[9] *See* 6 N.Y.C.R.R. § 701.14

[10] See 6 N.Y.C.R.R. §§ 702, 703.

Notice of Violation and Intent to File Suit
November 22, 2019
Page 3 of 13

Pralls Creek and the Arthur Kill consistently fail to meet state water quality standards; illegal stormwater discharges from this Facility contribute to this failure.[11]  In the past, DEC has designated Pralls Creek and the Arthur Kill as impaired pursuant to Section 303(d) of the CWA[12] for failure to meet minimum water quality standards for a number of pollutants, including floatables, low dissolved oxygen, dioxin, and PCBs and other toxins.[13]

While the Arthur Kill is a heavily traveled waterway, its water quality should not be sacrificed to pollutants.  At a minimum, J. Bruno must stop illegally discharging polluted stormwater and other effluents.

## II.

## STANDARDS AND LIMITATIONS ALLEGED TO HAVE BEEN VIOLATED AND ACTIVITIES ALLEGED TO BE VIOLATIONS

A.    **J. Bruno Is Discharging Stormwater Associated with Industrial Activity to Waters of the United States without a Permit.**

The CWA prohibits the discharge of pollutants to the waters of the United States except in accordance with a valid NPDES permit.[14] J. Bruno's industrial activity at the Facility has caused and continues to cause a "discharge of pollutants" within the meaning of Section 502(12) of the CWA[15] and a "stormwater discharge associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) from the Facility on at least each and every day that there has been a rain event of more than 0.1 inches.[16]

On its website, J. Bruno states that it provides "trucking, heavy equipment, fill materials, and commercial snow removal for all phases and types of construction."[17] J. Bruno's activities at the Facility include, but are not limited to, the disposal of construction and demolition debris, materials recycling, and vehicle storage and maintenance.  The Facility has exposed and continues to expose industrial pollutants to stormwater, at a minimum, by: (a) conducting vehicle maintenance and parking vehicles awaiting maintenance; (b) the crushing, processing, recycling, and storing of recycled construction and demolition waste and debris; (c) storing waste materials outdoors; and (d) from vehicles entering and leaving the Facility that track pollutants off site. During precipitation events (including runoff from rainfall and snow or ice melt events), pollutants are carried away from the Facility in stormwater discharges into wetlands that flow into Pralls Creek and the Arthur Kill.

---

[11] *See* NY DEC, *2016 Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy, available at* https://www.dec.ny.gov/docs/water_pdf/303dListfinal2016.pdf ("303(d) List").

[12] 33 U.S.C. § 1313(d).

[13] 303(d) List.

[14] *See* CWA §§ 301(a) and 402.

[15] 33 U.S.C. § 1362(12).

[16] EPA has determined that precipitation greater than 0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of evaluating stormwater runoff associated with industrial activity.  *See, e.g.*, 40 C.F.R. § 122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event).

[17] J. Bruno & Sons, Inc., www.jburnoandsons.com (last visited November 22, 2019).

Notice of Violation and Intent to File Suit
November 22, 2019
Page 4 of 13

Many of J. Bruno's activities at the Facility are conducted outdoors.  In carrying out the above activities at the Facility, J. Bruno engages in storing and handling materials, vehicles, and equipment in a manner that exposes pollutants to precipitation and snowmelt. The stormwater discharged from the Facility enters the Arthur Kill and can bring with it solids that suspend or dissolve in stormwater, metals, hydraulic fluids, fuel, and other pollutants.[18]

Trucks and other vehicles driving on and off the property are point sources of pollution. The Facility uses heavy vehicles and stores machinery outdoors.  Besides the wastes they carry, vehicles and industrial equipment at the Facility may expose many other pollutants to the elements, including gasoline, diesel fuel, anti-freeze, and hydraulic fluids.  J. Bruno's trucks and roll-off containers constitute point sources of water pollution in and of themselves.

All of these pollution sources are exposed to precipitation and snowmelt.  In addition to waste residues, these pollution sources also may release fuel, oil, lubricants, PCBs, PAHs, an array of metals, pH-affecting substances, and chemical residues.  These toxic pollutants are often generated in the form of small particulate matter, which settles on the ground and other surfaces that are exposed to stormwater and non-stormwater flows.

Because J. Bruno fails to adequately shelter and otherwise contain these materials to prevent their release to the environment, precipitation falls on and flows over exposed materials, fluids, and particulates.  Polluted stormwater discharges flow from the Facility to adjacent wetlands, Pralls Creek, and the Arthur Kill.

Pralls Creek and the Arthur Kill are "water[s] of the United States," as defined in 40 C.F.R. § 122.2 and, therefore, "navigable water[s]" as defined in Section 502(7) of the CWA.  J. Bruno does not have a NPDES permit for these discharges of pollutants. Thus, J. Bruno is discharging polluted industrial stormwater into navigable waters of the United States without the permit required under Sections 301 and 402 of the CWA.

**B.      J. Bruno is Violating the Clean Water Act by Failing to Apply for NPDES Permit Coverage.**

J. Bruno is engaged in the business of transporting waste, storing waste, and recycling and processing waste, and maintains equipment and trucks at the Facility. J. Bruno is therefore an industrial discharger engaged in local trucking and recycling under Standard Industrial Classification ("SIC") Codes 4212 and 5093, which are industrial activities included in Sectors P and N of the General Permit. Pursuant to Section 402(p) of the CWA and regulations promulgated by EPA pursuant to the CWA, J. Bruno must apply for coverage under the General Permit or an individual NPDES permit for J. Bruno's discharge of polluted stormwater. In

---

[18]  *See* EPA, "Industrial Stormwater Fact Sheet Series, Sector P: Motor Freight Transportation Facilities, Passenger Transportation Facilities, Petroleum Bulk Oil Stations and Terminals, Rail Transportation Facilities, and United States Postal Service Transportation Facilities." *available at* http://water.epa.gov/polwaste/npdes/stormwater/ upload/sector_p_transportationfacilities.pdf.

Notice of Violation and Intent to File Suit
November 22, 2019
Page 5 of 13

addition, J. Bruno must apply for an individual NPDES permit if the Facility is discharging process wastewater, or has any other non-stormwater discharge containing pollutants, that is not authorized by the General Permit. By failing to apply for coverage under the General Permit or an individual permit, J. Bruno is violating CWA Sections 301(a) and 402(a) and (p) and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).[19]

To be eligible to discharge stormwater associated with its industrial activities under the General Permit, J. Bruno must submit to DEC a registration form called a "Notice of Intent."[20] To register, J. Bruno is required, among other things, to list all stormwater discharges, to describe each of the industrial activities taking place in the drainage area of each discharge and the acreage of industrial activity exposed to stormwater, the immediate surface water body or wetland to which site runoff discharges, and the name of the watershed and nearest waterbody to which the site ultimately discharges and information about whether the receiving waters are impaired.  J. Bruno has failed to prepare and file a Notice of Intent or an application for an individual permit.

**C.**     **J. Bruno is Violating the Clean Water Act by Failing to Comply with the General Permit.**

As a discharger of stormwater associated with industrial activity, J. Bruno must comply at all times with the requirements of the General Permit (or an individual permit).[21] By discharging stormwater associated with industrial activity without complying with the General Permit, J. Bruno is violating CWA Sections 301(a) and 402(a) and (p).[22] The main General Permit requirements that J. Bruno has failed and continues to fail to meet are explained further below.

**1.   J. Bruno has not developed and implemented a Stormwater Pollution Prevention Plan.**

Before submitting a registration form, J. Bruno must prepare, make available, and implement a Stormwater Pollution Prevention Plan ("SWPPP") in accordance with schedules

---

[19] Sections 301(a) and 402(a) and (p) make it unlawful for J. Bruno to discharge stormwater associated with industrial activity without obtaining a NPDES permit.  40 C.F.R. Sections 122.26(c)(1) and (e)(1) require J. Bruno to apply for a NPDES permit that covers J. Bruno's discharge of stormwater associated with industrial activity.

[20] *See* General Permit, Part I.D.2.  In notifying J. Bruno that the Clean Water Act requires coverage under and compliance with a valid NPDES permit in order to lawfully discharge, and that submission of a Notice of Intent to DEC is required in order to obtain coverage under the General Permit, Baykeeper does not concede that all of the activities conducted at the Facility are necessarily eligible for coverage under that permit.  For example, if a Facility is discharging process wastewater, such as wash water, or has any other polluted non-stormwater discharge that is not authorized by the General Permit, then an individual NPDES permit is required and the failure to obtain and comply with an individual NPDES permit for such discharges also violates CWA §§ 301(a) and 402(p).  The conditions for eligibility to discharge under the General Permit are provided in Part I.B of the permit.

[21] This section discusses the compliance requirements of the General Permit.  If J. Bruno elects to seek coverage under an individual NPDES permit instead, the conditions of that individual permit will be at least as strict as those of the General Permit, thus J. Bruno will still be required to comply with all of the following.

[22] Sections 301(a) and 402(a) and (p) make it unlawful for J. Bruno to discharge stormwater associated with industrial activity without first complying with all of the conditions established in a NPDES permit.

Notice of Violation and Intent to File Suit
November 22, 2019
Page 6 of 13

established in the General Permit.[23] The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity. Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.[24]

Among other things, the SWPPP must include: a general site description; a general location map identifying the location of the facility and all receiving waters to which stormwater discharges; information related to a company stormwater pollution prevention team; a summary of potential pollutant sources; a description of control measures and best management practices; and schedules and procedures for implementation of control measures, monitoring, and inspections.[25]

J. Bruno has not developed and implemented a legally compliant SWPPP for the Facility, as required by Part III of the General Permit.[26]

### 2. J. Bruno has not implemented control measures and Best Management Practices that meet the best available technology standards.

J. Bruno cannot legally discharge stormwater under the General Permit from the Facility until J. Bruno implements mandatory general and sector-specific control measures called Best Management Practices ("BMPs") in order to minimize the discharge of pollutants from the Facility.[27]  The selected measures must reduce the discharge of pollution from each Facility to the extent practicable through use of the best available technology for the industry.

The General Permit requires that the owner or operator must select, design, install, and implement control measures (including best management practices), in accordance with good engineering practices, to meet the effluent limits contained in the permit.[28]  The General Permit's effluent limits include both numeric limits specific to certain sectors[29] and non-numeric technology-based effluent limits that apply to all facilities.[30]  These non-numeric, technology-based restrictions include minimizing the exposure of pollutants to stormwater[31] and minimizing the discharge of pollutants in stormwater[32] to the extent achievable using control measures

---

[23] See General Permit Part III.C.
[24] See General Permit Part III.A.
[25] See General Permit Part III.A.
[26] Baykeeper believes no SWPPPs exist for the Facility.  If a SWPPP exists at the Facility, then it is either facially inadequate or has not been fully and adequately implemented.
[27] See General Permit Part II.A.D; see also Part VII (setting forth sector-specific control measures and practices).
[28] General Permit Part II. See also Part III.A.7 ("The SWPPP must document in writing the location and type of BMPs installed and implemented at the facility to achieve the non-numeric effluent limits in Part II.A. and where applicable in Part VII, and the sector specific numeric effluent limitations in Part VII.").
[29] See General Permit, Part VII.
[30] See General Permit, Part II.
[31] See General Permit, Part II.1.
[32] See General Permit, Part II.1.

Notice of Violation and Intent to File Suit
November 22, 2019
Page 7 of 13

(including best management practices) that are technologically available, economically practicable, and achievable in light of best industry practice.[33]

     J. Bruno has not minimized the discharge of pollution to the extent achievable by implementing control measures or BMPs that are technologically achievable and economically practicable and achievable in light of best industry practice, as required by Parts II and VII of the General Permit.

**3.  J. Bruno has not conducted routine site inspections and complied with monitoring, recordkeeping, and reporting requirements.**

     J. Bruno must conduct an annual comprehensive site inspection and evaluation of areas where industrial materials or activities are exposed to precipitation or where spills and leaks have occurred within the past three years.[34]  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected.[35]  Records of this inspection must be kept for five years.[36]

     In addition, qualified facility personnel must carry out routine inspections at least quarterly.[37] During these inspections, personnel must evaluate conditions and maintenance needs of stormwater management devices, detect leaks and ensure the good condition of containers, evaluate the performance of the existing stormwater BMPs described in the SWPPP, and document any deficiencies in the implementation and/or adequacy of the SWPPP.[38]  Such deficiencies must then be addressed through corrective actions.

     The General Permit requires that all covered facilities conduct multiple types of analytical monitoring, and DEC may require additional individualized monitoring as well.[39]  In particular, all facilities authorized under the General Permit must:

- collect and analyze stormwater samples for each outfall at least annually;[40]
- conduct visual monitoring of stormwater discharges at least quarterly;[41]
- perform an annual dry weather inspection to detect non-stormwater discharges;[42]
- inspect, sample and monitor discharges from coal pile runoff;[43]

---

[33] See General Permit, Part II ("Effluent limits are required to minimize the discharge of pollutants.  The term 'minimize' means reduce and/or eliminate to the extent achievable using control measures (including best management practices…) that are technologically available and economically practicable and achievable in light of best industry practice.").

[34] *See* General Permit, Part IV.A.1.

[35] *See* General Permit, Part IV.A.1.

[36] *See* General Permit, Part IV.A.2.

[37] *See* General Permit, Part IV.B.

[38] *See* General Permit, Part IV.B.

[39] *See* General Permit, Part IV.F.1, 2.

[40] *See* General Permit, Part IV.F.2.

[41] *See* General Permit, Part IV.E.

[42] *See* General Permit, Part IV.C.

[43] *See* General Permit, Part IV.F.1.d.

Notice of Violation and Intent to File Suit
November 22, 2019
Page 8 of 13

- inspect, sample and monitor discharges from secondary containment structures and transfer areas;[44]
- document storm events during which any samples are taken;[45]
- document all of these monitoring activities;[46]
- keep records of the monitoring with the Facility's SWPPP;[47] and
- submit an annual report to DEC accompanied by a Discharge Monitoring Report detailing the results of all required stormwater samples, as well as reports that document any instance of non-compliance with benchmarks or numeric effluent limitations.[48]

Because J. Bruno engages in industrial activities associated with Sector P, sampling is required for:

- Oil & Grease;
- Chemical Oxygen Demand;
- Benzene;
- Ethylbenzene;
- Toluene; and
- Xylene.[49]

Because J. Bruno engages in industrial activities associated with Sector N, sampling may be required for:

- Total Suspended Solids;
- Chemical Oxygen Demand;
- Oil and Grease;
- Aluminum;
- Cadmium;
- Chromium;
- Copper;
- Iron;
- Lead; and
- Zinc.[50]

Baykeeper is not necessarily aware of all industrial activities taking place at the Facility. To the extent that industrial activities other than the above are carried out at the Facility, other

---

[44] *See* General Permit, Part IV.F.1.e.
[45] *See* General Permit, Part IV.D.3.
[46] *See* General Permit, Parts IV.
[47] *See* General Permit, Part IV.A.2.
[48] *See* General Permit, Part VI.A.
[49] *See* General Permit, Pat VII, Sector P.
[50] *See* General Permit, Pat VII, Sector N.

Notice of Violation and Intent to File Suit
November 22, 2019
Page 9 of 13

sampling may be required as well.[51]  This notice provides J. Bruno with sufficient information to identify the standards and limitations that apply to all categories of industrial activity.

J. Bruno has failed at the Facility to conduct the required annual and other routine inspections, monitoring, and testing, as required by, at least, Parts IV, VI, and VII of the General Permit. J. Bruno also has failed to retain records and submit monitoring reports to DEC pertaining to the Facility, as required by, at least, Parts IV, VI, and VII of the General Permit.

### 4.  J. Bruno has failed to comply with additional requirements located in Part VII of the General Permit.

As noted above, the General Permit contains various requirements specific to Sectors P and N. These requirements are collected in Part VII of the General Permit.  J. Bruno has failed to comply with these additional requirements of Part VII of the General Permit.

### 5.  J. Bruno is clearly violating the Clean Water Act.

In sum, J. Bruno's discharge of stormwater associated with industrial activities without a permit, J. Bruno's failure to apply for permit coverage, and J. Bruno's failure to comply with the above-listed conditions of the General Permit (or an individual NPDES permit) constitute violations of the General Permit and of Sections 301(a) and 402(p) of the Clean Water Act.

### III.

### PERSONS RESPONSIBLE FOR ALLEGED VIOLATIONS

J. Bruno & Sons, Inc. ("J. Bruno") is the person responsible for the violations alleged in this Notice.  J. Bruno has operational control over the day-to-day industrial activities at this Facility.  Therefore, J. Bruno is responsible for managing stormwater at the Facility in compliance with the CWA.  Baykeeper hereby puts J. Bruno on notice that if Baykeeper subsequently identifies additional persons as also being responsible for the violations set forth above, Baykeeper intends to include those persons in this action.

### IV.

### LOCATION OF THE ALLEGED VIOLATION

The violations alleged in this Notice have occurred and continue to occur at the Facility located at 280 Meredith Ave., Staten Island, NY 10314 (Block: 2810 and Lots: 59 and 80). Stormwater associated with industrial activity discharges into wetlands that connect to the Arthur Kill.  The failure to develop and implement pollution prevention plans and take the other

---

[51] *See* General Permit, Part VII.

Notice of Violation and Intent to File Suit
November 22, 2019
Page 10 of 13

required measures are violations occurring at the Facility in general and in the inadequate documents themselves.[52]

## V.

## DATES OF VIOLATION

Every day upon which J. Bruno has failed to apply for permit coverage since J. Bruno first commenced operations at the Facility and discharged polluted stormwater is a separate violation of Section 301(a) of the CWA and EPA's regulations implementing the CWA.[53]

Additionally, J. Bruno has discharged pollution without a permit in violation of Section 301(a) of the CWA on every day since J. Bruno commenced operations at the Facility on which there has been a measurable precipitation event or discharge of previously accumulated precipitation (i.e., snowmelt) over 0.1 inches.

Finally, if J. Bruno seeks permit coverage after receiving this letter but fails to fully comply with the requirements of the General Permit (or an individual permit), each day upon which J. Bruno claims coverage under a NPDES permit but fails to comply with that permit will constitute a separate day of violation with respect to each unmet condition of that permit.

J. Bruno is liable for the above-described violations occurring prior to the date of this letter, and for every day after the date of this letter that these violations continue.  In addition to the violations set forth above, this Notice covers all violations of the CWA evidenced by information that becomes available to Baykeeper after the date of this Notice of Intent to File Suit.[54]  These violations are ongoing and, barring full compliance with the permitting requirements of the Clean Water Act, these violations will continue.

---

[52] The federal courts have held that a reasonably specific indication of the area where violations occurred, such as the name of the facility, is sufficient and that more precise locations need not be included in the notice.  *See, e.g.*, *Natural Resources Defense Council v. Southwest Marine, Inc.*, 945 F. Supp. 1330, 1333 (S.D. Cal. 1996), aff'd 236 F.3d 985, 996 (9th Cir. 2000); *City of New York v. Anglebrook Ltd. Partnership*, 891 F. Supp. 900, 908 (S.D.N.Y. 1995); *United Anglers v. Kaiser Sand & Gravel Co.*, No. C 95-2066 CW, 1995 U.S. Dist. LEXIS 22449 at *4 (N.D. Cal. Sept. 27, 1995)

[53] *See also* 33 U.S.C. §§ 402(p)(3)(A) and (p)(4)(A) (requiring the establishment of industrial stormwater NPDES permits and of a permit application process).

[54] *See, e.g. Public Interest Research Grp. v. Hercules, Inc.*, 50 F.3d 1239, 1248-49 (3d Cir.1995) (a notice that adequately identifies specific violations to a potential defendant also covers repeated and related violations that the plaintiff learns of later. "For example, if a permit holder has discharged pollutant 'x' in excess of the permitted effluent limit five times in a month but the citizen has learned only of four violations, the citizen will give notice of the four violations of which the citizen then has knowledge but should be able to include the fifth violation in the suit when it is discovered.")

Notice of Violation and Intent to File Suit
November 22, 2019
Page 11 of 13

## VI.

## **RELIEF REQUESTED**

Baykeeper will ask the court to order J. Bruno to comply with the CWA, to pay penalties, and to pay Baykeeper's costs and legal fees.

First, Baykeeper will seek declaratory relief and injunctive relief to prevent further violations of the Clean Water Act pursuant to Sections 505(a) and (d) and such other relief as permitted by law. Baykeeper will seek an order from the Court requiring J. Bruno to obtain NPDES permit coverage and to correct all other identified violations through direct implementation of control measures and demonstration of full regulatory compliance.

Second, pursuant to Section 309(d) of the CWA,[55] each separate violation of the CWA subjects J. Bruno to a penalty not to exceed $37,500 per day for each violation that occurred prior to November 2, 2015, and up to $52,414 per day for each violation that occurred after November 2, 2015.[56] Baykeeper will seek the full penalties allowed by law.

Third and lastly, pursuant to Section 505(d) of the CWA, Baykeeper will seek recovery of its litigation fees and costs (including reasonable attorney and expert witness fees) associated with this matter.[57]

## VII.

## **PERSONS GIVING NOTICE**

The full name, address, and telephone number of the persons giving notice are as follows:

Raritan Baykeeper, Inc.
d/b/a NY/NJ Baykeeper
30 Washington Street
Matawan, NJ 07747
732-888-9870
Attn.: Greg Remaud, Executive Director

---

[55] 33 U.S.C. § 1319(d); *see also* 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).
[56] 40 C.F.R. §§ 19.2 and 19.4.
[57] 33 U.S.C. § 1365(d).

Notice of Violation and Intent to File Suit
November 22, 2019
Page 12 of 13

**VIII.**

**IDENTIFICATION OF COUNSEL**

Baykeeper is represented by legal counsel in this matter.  The name, address, and telephone
number of Baykeeper's attorneys are:

Edan Rotenberg, Esq.
Super Law Group, LLC
180 Maiden Lane, Suite 603
New York, New York 10013
(212) 242-2355

**IX.**

**CONCLUSION**

The foregoing provides more than sufficient information to permit J. Bruno to identify the
specific standard, limitation, or order alleged to have been violated, the activity alleged to
constitute a violation, the person or persons responsible for the alleged violation, the location of
the alleged violation, the date or dates of such violation, and the full name, address, and
telephone number of the person giving notice.[58]

If J. Bruno has developed a SWPPP, Baykeeper requests that J. Bruno send a copy to the
undersigned attorney.[59]  Otherwise, Baykeeper encourages J. Bruno to begin developing a
SWPPP immediately after receiving this letter and asks that J. Bruno please inform the
undersigned attorney of J. Bruno's efforts so Baykeeper can work with J. Bruno to avoid
disputes over the contents of the SWPPP.[60]

During the sixty-day notice period, Baykeeper is willing to discuss effective remedies for the
violations noted in this letter that may avoid the necessity of protracted litigation.  If J. Bruno
wishes to pursue such discussions, please contact the undersigned attorney immediately so that

---

[58] 40 C.F.R. § 135.3(a).

[59] Note that under Part III.C.2 of the General Permit, the owner or operator of a facility "must make a copy of the
SWPPP available to the public within 14 days of receipt of a written request."

[60] Baykeeper will not send a new notice letter in response to any effort J. Bruno makes to come into compliance with
the Clean Water Act after receiving this letter, for example, by developing a SWPPP.  The federal courts have held
that citizens sending a notice letter are not required to identify inadequacies in compliance documents that do not yet
exist and are "not required to send a second notice letter in order to pursue specific claims regarding the
inadequacies of [a defendant's] post-notice compliance efforts." *WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d
913, 920 (9th Cir. 2004). *See also Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985, 997
(9th Cir. 2000) ("subject matter jurisdiction is established by providing a notice that is adequate on the date it is
given to the defendant.  The defendant's later changes . . . do not retroactively divest a district court of jurisdiction
under 33 U.S.C. § 1365(b)."); *City of New York v. Anglebrook L.P.*, 891 F. Supp. 900, 908 (S.D.N.Y. 1995)
(plaintiff's notice letter based on inadequacies of defendant's original SWPPP held sufficient to establish court's
jurisdiction, even though defendant later prepared a revised SWPPP).

Notice of Violation and Intent to File Suit
November 22, 2019
Page 13 of 13

negotiations may be completed before the end of the sixty-day notice period.  We do not intend to delay the filing of a complaint in federal court, regardless of whether discussions are continuing at the conclusion of the sixty days.

Very truly yours,

Edan Rotenberg
Super Law Group, LLC
180 Maiden Lane, Suite 603
New York, New York 10038
(212) 242-2355

cc:

Andrew Wheeler, Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Peter D. Lopez, EPA Region 2 Administrator
Environmental Protection Agency
290 Broadway
New York, NY 10007-1866

Basil Seggos, Commissioner
New York State Department of Environmental Conservation
625 Broadway
Albany, NY 12233-1011